Argued June 4, affirmed September 10, 1973

# CONSOLIDATED FREIGHTWAYS CORPORATION OF DELAWARE, *Respondent, v.* EDDY, *Appellant.*

513 P2d 1161

*Robert G. Chidester,* Portland, argued the cause and filed briefs for appellant.

*Richard H. Williams,* Portland, argued the cause for respondent. With him on the brief were James H.

Clarke and James C. Dezendorf of Dezendorf, Spears, Lubersky & Campbell.

McALLISTER, J.

Consolidated Freightways, a motor carrier, brought this action to recover from defendant, as consignee, unpaid freight charges for the interstate shipment of a printing press. Defendant appeals from a judgment for plaintiff. We affirm.

Plaintiff's complaint alleged that on September 29, 1970, it delivered to defendant a printing press which had been shipped to defendant "collect" by Graphic Machinery Co. from Oklahoma City, Oklahoma, and that the unpaid freight charges thereon were $1,960.19, which defendant had failed to pay.

Defendant's answer admitted plaintiff's corporate status and qualifications to do business in Oregon, but denied all the other allegations of the complaint. Defendant then alleged two affirmative defenses of estoppel. First, defendant alleged that he had no knowledge that the shipment was "collect," that plaintiff with full knowledge unconditionally relinquished possession of the shipment without making demand upon defendant for payment of freight charges and thereafter sought to collect the charges from the shipper, and that plaintiff's transaction with the shipper involved extension of credit beyond the seven-day limit imposed by the Interstate Commerce Commission.

For his second affirmative defense, defendant again alleged his lack of knowledge that the shipment was "collect," and that plaintiff unconditionally relinquished possession without demand for payment of freight charges. He further alleged that plaintiff un-

reasonably delayed for two years to notify defendant of plaintiff's claim that defendant was liable for the freight charges, that defendant's contract with the shipper provided that the shipper was responsible for the freight charges, that defendant has paid the shipper the contract price in full, and that during plaintiff's two-year delay the shipper became insolvent.

■ We first take note of the unorthodox procedure in the trial court which apparently was based on an informal stipulation of the parties. Plaintiff demurred to both affirmative defenses on the following grounds:

"(1) no act or omission of a motor carrier will estop it from collecting the proper published rate for the service performed and (2) the Interstate Commerce Act imposes upon a consignee who accepts a shipment the liability for the payment of freight and other charges without regard to any contract and even though the consignee may have relied upon a promise made by a third party to pay for all such charges."

The only ground for demurrer to new matter in an answer recognized by ORS 16.250 is that "such new matter does not constitute a defense or counterclaim." Since the parties both in the trial court and in this court assumed that plaintiff's demurrer raised that basic issue, we will indulge in the same assumption.

The trial court file contains a copy of a letter from counsel for the plaintiff to counsel for the defendant confirming an oral agreement "that the outcome of the case would follow the ruling on the demurrer," that if the court sustained the demurrer to defendant's defenses plaintiff would be entitled to a judgment and if the court held that the "estoppel defenses are good defenses" then the complaint would be dismissed.

The trial court sustained plaintiff's demurrer to the defenses and allowed defendant time to further plead. When defendant failed to plead further the court entered a judgment for plaintiff for the amount demanded in plaintiff's complaint. This procedure overlooked the general denial by defendant of the allegations of plaintiff's complaint. However, since defendant's notice of appeal recites that the judgment was rendered "pursuant to stipulation of the parties prior to hearing on [the] demurrer" we will proceed to decide the issue of whether the new matter in the answer constitutes a defense to plaintiff's complaint.

Since this case involves an interstate shipment by motor carrier, part II of the Interstate Commerce Act, formerly known as the Motor Carrier Act, 1935, is applicable. The following portions thereof are pertinent:

"No common carrier by motor vehicle shall charge or demand or collect or receive a greater or less or different compensation for transportation or for any service in connection therewith between the points enumerated in such tariff than the rates, fares, and charges specified in the tariffs in effect at the time; and no such carrier shall refund or remit in any manner or by any device, directly or indirectly, or through any agent or broker or otherwise, any portion of the rates, fares or charges so specified, or extend to any person any privileges or facilities for transportation in interstate or foreign commerce except such as are specified in its tariffs: * * *." 49 USCA 317 (b).

"No common carrier by motor vehicle shall deliver or relinquish possession at destination of any freight transported by it in interstate or foreign commerce until all tariff rates and charges thereon have been paid, except under such rules and regulations as the Commission may from time to time

prescribe to govern the settlement of all such rates and charges, including rules and regulations for weekly or monthly settlement, and to prevent unjust discrimination or undue preference or prejudice: * * *." 49 USCA 323.

The Commission has promulgated the following regulation:

"Upon taking precautions deemed by them to be sufficient to assure payment of the tariff charges within the credit period herein specified, common carriers by motor vehicle may relinquish possession of freight in advance of the payment of the tariff charges thereon and may extend credit in the amount of such charges to those who undertake to pay them, such persons herein being called shippers, for a period of 7 days excluding Saturdays, Sundays, and legal holidays. When the freight bill covering a shipment is presented to the shipper on or before the date of delivery, the credit period shall run from the first 12 o'clock midnight following delivery of the freight. When the freight bill is not presented to the shipper on or before the date of delivery, the credit period shall run from the first 12 o'clock midnight following the presentation of the freight bill. * * * " 49 CFR § 1322.1 (1972).

The above provisions have nearly identical counterparts in the statutes and regulations governing rail carriers. 49 USCA § 6 (7), 49 USCA § 3 (2), 49 CFS 1320.1 (48-hour credit period). The parties have cited and relied on cases involving rail carriers and such cases are apposite.

■ The purpose of the above provisions of the Interstate Commerce Act is the elimination of rate and credit discrimination. *Pittsburgh, C. C. & St. L. R. Co. v. Fink*, 250 US 577, 40 S Ct 27, 63 L Ed 1151, 1153 (1919); *Louisville & N. R. Co. v. Central Iron & C. Co.*, 265 US 59, 44 S Ct 441, 68 L Ed 900, 902 (1924);

*Consolidated Freightways Corp. of Del. v. Admiral Corp.*, 442 F2d 56, 61 (7th Cir 1971). In accord with this purpose, the Supreme Court held, in the *Fink* case, that an innocent consignee who has been undercharged by the carrier is liable for the full freight according to the tariff rates, even though the undercharge was the carrier's fault. The consignee, the court said, must be presumed to know the law and to have understood that only the rate fixed by the tariff could be charged:

> "* * * The transaction, in the light of the act, amounted to an assumption on the part of Fink to pay the only legal rate the carrier had the right to charge or the consignee the right to pay. * * *

> "* * * Nor can the defendant in error successfully invoke the principle of estoppel against the right to collect the legal rate. Estoppel could not become the means of successfully avoiding the requirement of the act as to equal rates, in violation of the provisions of the statute. * * *" 63 L Ed at 1153.

In *Louisville & N. R. Co. v. Central Iron & C. Co.*, supra, the consignee had paid the freight demanded by the carrier upon delivery, but the carrier discovered three years later that it had not charged enough. It then brought an action against the shipper, who refused to pay. The Supreme Court again stated that the amount of freight was fixed by law and could not be varied:

> "* * * Nor could any act or omission of the carrier (except the running of the Statute of Limitations) estop or preclude [the carrier] from enforcing payment of the full amount by a person liable therefor. * * *" 68 L Ed at 902.

The court reaffirmed the liability of the consignee in the following language:

> "* * * under the rule of the Fink Case, if a

shipment is accepted, the consignee becomes liable, as a matter of law, for the full amount of the freight charges, whether they are demanded at the time of delivery, or not until later. * * *" 68 L Ed at 904.

The lower federal courts, in *undercharge* cases, have uniformly followed the *Fink* case and held that the carrier cannot be estopped, by having billed and collected a lesser amount, to collect the full amount properly due under the applicable tariff. See *Southern Pacific Company v. Miller Abattoir Company*, 454 F2d 357, 359 (3d Cir 1972); *Miller v. Ideal Cement Company*, 214 F Supp 717 (D Wy 1963); *Bernstein Bros. Pipe & Mach. Co. v. Denver & R. G. W. R. Co.*, 193 F2d 441 (10th Cir 1951); *Porto Transport v. Consolidated Diesel Elec. Corp.*, 19 FRD 256, 258-259 (SD NY 1956).

The defendant relies, however, on a line of federal cases holding that a carrier may be estopped to collect from a consignee when the carrier has represented that the freight charges were prepaid by the shipper and the consignee, in reliance on that representation, has accepted the shipment and paid the shipper for the goods. *Southern Pacific Transportation Co. v. Campbell Soup Co.*, 455 F2d 1219 (8th Cir 1972); *Consolidated Freightways Corp. of Del. v. Admiral Corp.*, 442 F2d 56 (7th Cir 1971); *Missouri Pacific Railroad Co. v. National Milling Co.*, 409 F2d 882 (3d Cir 1969); *Davis v. Akron Feed & Fuel Co.*, 296 F 675 (6th Cir 1924). The court in the *Admiral Corp.* case explained the distinction as follows:

"The undercharge cases are thus consistent with and, indeed, support our conclusion that [49 USCA 323] was not intended to fasten a rigid liability upon a consignee. Congress left the initial determination of a party's liability for freight charges to express contractual agreement or implication of law. * * * So long as payment of the full tariff

charges may be demanded from some party, the anti-discrimination policy of the Section is satisfied. Congress did not undertake to settle all issues of collection with the enactment of [Section 323]. Nor did Congress intend to fashion a sword to insure collection in every instance and a shield to insulate the carrier from the legal consequences of otherwise negligent or inequitable conduct.

\* \* \* \* \*

"\* \* \* The crucial question is not whether estoppel is urged as a bar to collection of the tariff rate as such, but whether the use of estoppel to prevent recovery on the facts of the particular case contradicts the statutory policy of [Section 323] to curb discriminatory treatment of shippers." 442 F2d at 62.

See, also, *Aero Mayflower Transit Company v. Harbin*, 126 Ga App 72, 190 SE2d 91 (1972); *Tom Hicks Trans. Co. v. Ford, Bacon & Davis Texas Inc.*, 482 SW2d 364 (Tex Civ App 1972). *Contra, Empire Petroleum Co. v. Sinclair Pipeline Co.*, 282 F2d 913 (10th Cir 1960).

The Supreme Court has not considered this question. The lower courts holding that estoppel is available under some circumstances have reasoned that the *Fink* case does not apply where the effect of recognizing the estoppel is not to permit the collection of a different rate. *Southern Pacific Transportation Co. v. Campbell Soup Co.*, supra, 455 F2d at 1222; *Consolidated Freightways Corp. of Del. v. Admiral Corp.*, supra, 442 F2d at 62-63. Also, in *Davis v. Akron Feed & Fuel Co.*, supra, 296 F at 677, the court pointed out that the theory of the undercharge cases is that the shipper and consignee are conclusively presumed to know the published tariff rate, but that there can be no presumption that the consignee knows that a shipment designated "prepaid" by the carrier has not in fact

been prepaid. When the question is not the amount of the freight charge, but merely which party is to be responsible for paying that amount, the possibility of discrimination in rates is not involved. The purpose of the legislation is not thwarted by holding that a carrier may be estopped to collect its freight charges from the consignee, and must look solely to the shipper.

We find it significant that all of the cases holding that the carrier was estopped from collecting its freight charges from the consignee relied on the fact that the bill of lading contained a notation that the freight charges were "prepaid." Defendant relies primarily on *Consolidated Freightways Corp. of Del. v. Admiral Corp.,* supra. In that case the court found estoppel from the following circumstances:

> "Commencing in September 1965, Rogers [shipper] selected plaintiff as the motor carrier to transport Admiral's import freight. The goods moved on plaintiff's bills of lading which showed Admiral as the consignee and Rogers as the shipper and party to be billed. The bills of lading were also marked by Rogers as 'prepaid' or 'to be prepaid,' meaning that Rogers, the shipper, was to be billed by plaintiff and pay its charges." 442 F2d at 58.

The following cases also find the carrier estopped because of similar notations on the bills of lading or other documents: *Southern Pacific Transportation Co. v. Campbell Soup Co.,* supra; *Missouri Pacific Railroad Co. v. National Milling Co.,* supra; *Tom Hicks Trans. Co. v. Ford, Bacon & Davis Texas Inc.,* supra. In *Aero Mayflower Transit Company v. Harbin,* supra, there was an express agreement between the carrier, the defendant, and his new employer that the cost of moving his goods were to be paid by the new employer and the bill of lading so stated. In

that case the estoppel is also based on the carrier's delay in billing the employer until after the employer was in financial difficulty.

It is true that in *Admiral* the court based its holding on the additional ground that the carrier granted the shipper credit extensions "well beyond the seven-day limit imposed upon such transactions by the Interstate Commerce Commission" which "unlawful and lax credit extensions" both "contributed substantially to [the carrier's] ultimate inability to recover payment from [the] shipper" and "also increased the amount of loss which resulted from [the shipper's] financial failure." As we read the *Admiral* case, however, it does not support the proposition that the mere failure of the carrier to collect the freight charges from the shipper within seven days estops the carrier from later collecting the charges from a consignee who is primarily liable therefor. Defendant does not allege that the carrier in this case granted to this shipper any "unlawful and lax credit extensions".

We agree with the cases holding that the conduct of a carrier may estop it from collecting freight charges from a consignee, but find that the new matter in defendant's answer fails to allege facts estopping plaintiff from collecting its freight charges from defendant in this case. In the first place, there is no allegation that the bill of lading contained any notation that the freight had been prepaid and no allegation that defendant was misled into assuming that the freight had been prepaid by any other representations or conduct of the carrier. The first affirmative defense alleges that plaintiff's "transaction with shipper involved credit extensions in excess of the seven day limit imposed upon such transactions by the Interstate

Commerce Commission," but also alleges that after delivering the printing press to defendant plaintiff "sought to collect freight charges from the shipper." In construing the answer against the pleader (*Firemen's Insurance Co. v. Motors Insurance Corp.*, 245 Or 601, 604, 423 P2d 754 (1967)) we may infer that the plaintiff promptly sought to collect its freight charges from the shipper and thereafter diligently attempted to collect from the shipper and that any extension of credit beyond the seven-day limit was involuntary. Defendant does not allege that he paid for the goods after the seven-day period and does not allege that if promptly notified of plaintiff's inability to collect from the shipper that he would have been able to recover the freight from the shipper by his own efforts. Lastly, it has been held that the seven-day limit upon credit extensions imposed by the Interstate Commerce Commission is to prevent discrimination and is not for the benefit of the consignee. *AAA Trucking Corporation v. Spherex, Inc.*, 272 A2d 594 (NH 1970); *United States v. Pennsylvania Railroad Company*, 308 FS 293, 297 (ED Pa 1969); *United States v. General Expressways, Inc.*, 270 FS 115 (DC Colo 1967).

■ Finally, going beyond the specific grounds stated in its demurrer, plaintiff argues that the affirmative allegations of the answer are insufficient because defendant has not alleged that he relied on plaintiff's actions. Our cases uniformly hold that such reliance must be pleaded. *Sertic v. Roberts*, 171 Or 121, 131, 136 P2d 248 (1943); *Mahon v. Harney County Nat. Bank*, 104 Or 323, 332, 206 P 224 (1922); *Haun v. Martin*, 48 Or 304, 307, 86 P 371 (1906); *First Nat. Bank v. McDonald*, 42 Or 257, 260, 70 P 901 (1902). If this were the only ground upon which defendant's answers are held to be deficient we would be inclined to remand

the case and permit defendant to ask for leave to amend his answer, but since defendant has elected to submit the case on the basic issue of whether his answers allege necessary elements of estoppel and declined to plead further we see no point in remanding for further proceedings.

The judgment of the trial court is affirmed.